IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ARRON MURPHY,
Plaintiff,

v.

Case No. 18–CV–01077–JPG–MAB

WEXFORD HEALTH SOURCES, INC. and
VIPIN SHAH,
Defendants.

# MEMORANDUM AND ORDER

## I. INTRODUCTION

Plaintiff Arron Murphy brought this Eighth Amendment claim to challenge the treatment he received for an oral infection following a wisdom tooth extraction.[1] Defendants Wexford Health Sources, Inc. and Vipin Shah filed a joint motion for summary judgment. (Defs.' Mot. Summ. J., ECF No. 39). Magistrate Judge Beatty issued a Report and Recommendation (R. & R.) recommending that the Court grant Defendants' motion. (R. & R., ECF No. 55). Plaintiff objected. (P.'s Obj., ECF No. 56). After de novo review of the record, the Court **ADOPTS** the R. & R. **AS MODIFIED BY THIS OPINION** and **GRANTS** Defendants' motion for summary judgment.

## II. PROCEDURAL & FACTUAL HISTORY

On Wednesday, May 4, 2016, Plaintiff—then an inmate at Robinson Correctional Center in Robinson, Illinois—had a wisdom tooth extracted by a prison dentist. (Pl.'s Consent Form, ECF No. 46–5). The dentist prescribed Plaintiff a pain reliever to take after the procedure but not an antibiotic. (Pl. Dep. 15, ECF No. 64–4).

---

[1] Plaintiff noted in his deposition that the documents submitted in this case misspell his name as "Aaron." (Pl.'s Dep. 3, ECF No. 46–4).

The following evening, Plaintiff was experiencing soreness and swelling, and he submitted a healthcare form requesting to be seen by medical staff in the morning. (Id. at 22). The prison dentist was not on site from Friday to Sunday. (Shah Dep. 8, ECF No. 44–1).

On Friday, May 6, Nurse Rice examined Plaintiff. (Rice Dep. 4, ECF No. 44–6). Nurse Rice noted that Plaintiff was experiencing a soft-tissue infection and "softball size" swelling. (Pl.'s Progress Notes 1). Nurse Rice spoke to Defendant Shah—the on-site physician—in person. (Rice Dep. 5). Defendant Shah was surprised that the dentist did not prescribe Plaintiff an antibiotic following the wisdom-tooth extraction, and he prescribed Plaintiff a five-day course of penicillin. (Shah Dep. 8). Plaintiff believed that penicillin was "one of the most commonly chosen drugs by M.D.s for dental infection." (Id. at 7). He only prescribed a five-day course, rather than 10, because the dentist would be available by that time to evaluate Plaintiff himself. (Id.). Defendant Shah instructed Nurse Rice to contact him as soon as possible if Plaintiff began experiencing shortness of breath. (Pl.'s Progress Notes 6).

On May 7 at 1:00 AM, Plaintiff returned to the healthcare unit, again complaining of swelling and difficulty swallowing. (Pl.'s Progress Notes 3). Plaintiff was told by medical staff to return later in the morning. (Id.). Defendant Shah, who did not work on the weekend, was not contacted. (Shah Dep. 9). However, Defendant Shah testified that he did not believe that he should have been contacted since it typically takes several days for penicillin to provide relief, and Plaintiff was not experiencing any symptoms of acute emergency, such as fever and shortness of breath. (Id.).

Plaintiff was reexamined at 9:00 AM. (Pl.'s Progress Notes 6). Nurse Rice noted that he was unable to obtain a blood sample due to Plaintiff's history of intravenous drug abuse. (Id.). This made it difficult for Defendant Shah to determine whether the infection was responding to the antibiotic. (Shah Dep. 18). Nurse Rice contacted Defendant Shah and notified him that Plaintiff's condition worsened. (Pl.'s Progress Notes 6). Defendant Shah then prescribed Plaintiff Solu-Medrol—a steroid

injection—because he thought that the increased swelling was possibly due to an allergic reaction, and Solu-Medrol "helps the swelling and allergic reaction." (Shah Dep. 10). In Defendant Shah's practice, Solu-Medrol "has always helped the bacteria to subside more along with the antibiotic." (Id. at 11). He also instructed Nurse Rice to reassess Plaintiff at 2:00 PM. (Pl.'s Progress Notes 7). Defendant Shah was not concerned that the antibiotic was not working, however, since it "just started yesterday," and he did not think that Plaintiff needed emergency care at that time. (Id.).

On Monday, May 9 at 7:20 AM, Plaintiff revisited the healthcare unit and was examined by Defendant Shah. (Shah Dep. 13). Plaintiff informed him that his throat was still swollen, making it difficult for him to eat. (Id.). Defendant Shah changed Plaintiff's course of treatment from penicillin to Rocephin—another antibiotic—because "it apparently works faster." (Id.). Plaintiff was then placed on 23-hour observation to "see if the treatment is helping or [the] condition is getting stable or worse." (Id.). However, Defendant Shah did not believe that Plaintiff's condition had worsened because he "didn't see . . . high temperature or any shortness of breath or any respiratory difficulty." (Id. at 12).

Plaintiff was admitted into the infirmary the next day. (Pl.'s Progress Notes 15). Defendant Shah became concerned that Plaintiff's condition was not improving: The swelling had not subsided, and Defendant Shah observed that the infected area in Plaintiff's mouth was turning grey. (Shah Dep. 14). At the time, Plaintiff maintained normal vitals signs. (Id. at 15). By 5:30 PM, however, Plaintiff experienced a 105-degree fever and chilling was visible. (Pl.'s Progress Notes 17). Defendant Shah instructed Plaintiff to take a hot shower and prescribed a pain reliever to reduce the fever. (Id.). Plaintiff was reassessed three times throughout the evening, and his fever dropped to 98.5 degrees by 11:15 PM. (Id. at 18–19).

The following morning on May 11, 2016, Plaintiff reported for the first time that he "heard some whistling." (Shah Dep. 16). Defendant Shah became concerned that Plaintiff was experiencing respiratory difficulty, (Id.), and he ordered that Plaintiff be immediately sent to the emergency room,

— 3 —

(Pl.'s Progress Notes 21). Defendant Shah also determined that since the infection was not resolved with the steroid injection and the antibiotic, the issue was something more than a simple bacterial infection. (Shah Dep. 19).

Plaintiff was sent to Crawford Memorial Hospital for a CT scan and later arrived at Carle Hospital for treatment. (Bailey Dep. 9, ECF No. 44–5). He was examined by Dr. Bailey, a Harvard-trained surgeon with a specialty in "diseases and diagnoses of the oral cavity and the head and neck." (Id. at 5–6). Dr. Bailey agreed that penicillin is commonly prescribed to treat post-surgical infections and that it is an appropriate part of treatment. (Id. at 58–59). But although swelling and discomfort after oral surgery tends to get worse two-to-three days after surgery, it tends to improve after that point. (Id. at 56). Dr. Bailey concluded that Plaintiff was experiencing Ludwig's angina: a very rare and advanced infection in the neck requiring urgent surgical treatment. (Id. at 15–16, 70). Dr. Bailey conducted a three-part surgery that ultimately proved successful.

Plaintiff filed suit in this Court in May 2018. He alleges that Defendant Shah's chosen course of treatment and the delay in sending him to the emergency room constitute Eighth Amendment violations. (Compl. 4–5, ECF No. 1). He further alleges that Defendant Wexford is liable under 42 U.S.C. § 1983, either under a vicarious liability theory or due to the existence of an express policy or widespread practice of not promptly administering antibiotics. (Id. at 5). Plaintiff also raises a state-law medical malpractice claim. (Id.). Defendants filed a joint motion for summary judgment on the Eighth Amendment claims. (Defs.' Mot. Summ. J., ECF No. 39).

Plaintiff largely relies upon the testimony of Dr. Robert Citronberg to bolster his argument that Defendant Shah was deliberately indifference to his medical needs. Dr. Citronberg is a physician with decades of experience treating infectious diseases. (See Citronberg's Op. 2, ECF No. 46–3). In his opinion, Defendant Shah violated the standard of care in three ways: (1) he prescribed penicillin instead of a more appropriate antibiotic, such as amoxicillin; (2) he failed to transfer Plaintiff to the

emergency room when it became apparent that Plaintiff was not improving; and (3) he prescribed Solu-Medrol in an uncontrolled setting. (Id. 3). Although Dr. Citronberg disagreed with Defendant Shah's choice of treatment, however, he agreed that Defendant Shah provided "what he thought was the right treatment" and did not "wholly disregard" Plaintiff's condition. (Citronberg Dep. 3, ECF No. 44–2).

In rebuttal, Defendants proffered the testimony of Dr. George Kushner and Dr. Ernest Jackson. In Dr. Kushner's opinion, "[s]ynergistic steroid and antibiotic therapy is a commonly accepted therapy and was appropriate in this circumstance." (Kushner's Op. 1, ECF No. 44–8). Dr. Jackson similarly opined that Defendant Shah's choice to prescribe penicillin and steroids was appropriate. (Jackson's Op. 1, ECF No. 44–4). He further stated that Defendant Shah did not disregard Plaintiff's condition "at any point in time." (Id.).

Magistrate Judge Beatty issued a R. & R. recommending the Court to grant Defendants' motion for summary judgment. Plaintiff objected to the R. & R.'s factual recitation, the weight given to Defendants' evidence, and Magistrate Judge Beatty's legal conclusions. This Court reviewed the record de novo.

### III. LAW & ANALYSIS

Regardless of whether Defendant Shah administered the *correct* treatment, his decisions were not of a kind prohibited by the Eighth Amendment. The fact that another physician—benefitted with hindsight and specialized knowledge—disagrees with a course of treatment, by itself, is insufficient to prove deliberate indifference to a serious medical need. No reasonable jury faced with this record could find that Defendant Shah violated the Eighth Amendment.

#### A. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A fact is "genuine" when it is reasonably contestable, SMS Demag Aktiengesellschaft v. Material Scis. Corp., 565 F.3d 365, 368 (7th Cir. 2009), and a fact is "material" when it might affect the outcome of the suit, Taylor-Novotny v. Health Alliance Med. Plans, Inc., 772 F.3d 478. 488 (7th Cir. 2014). The Court may not weight the evidence to resolve factual disputes or make credibility determinations; it must only determine whether there is a genuine issue for trial. Hasan v. Foley & Lardner LLP, 552 F.3d 520, 526 (7th Cir. 2008). The record must be viewed in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### B. Defendants Did Not Violate the Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. CONST. amend VIII. This prohibition also imposes duties on prison officials, such as ensuring that inmates receive adequate medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). However, "a prison official violates the Eighth Amendment only when two requirements are met." Id. at 834. First, the deprivation experienced by the prisoner must be objectively serious. Id. Second, the prison official must have acted with a "sufficiently culpable state of mind." Id. (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)). The parties in this case agree that Plaintiff experienced an objectively serious medical need, leaving only the second requirement in dispute.

"In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). While deliberate indifference to a serious medical need violates the Eighth Amendment, "negligen[ce] in diagnosing or treating a medical condition" does not. Estelle, 429 U.S. at 106. But "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." Farmer, 511 U.S. at 842.

In the medical context, the plaintiff can meet its burden by proving that "the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances."

Collignon v. Milwaukee Cty., 163 F.3d 982, 989 (7th Cir. 1998); see also Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). This includes situations where a prison official persists in a course of treatment that is known to be ineffective, Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006), or chooses an "easier and less efficacious treatment" without exercising professional judgment, Conley v. Birch, 796 F.3d 742, 747 (7th Cir. 2015). As the Seventh Circuit noted in Petties v. Carter, "a medical decision that has no support in the medical community, along with a suspect rationale provided for making it, can support a jury finding that a doctor *knew* his decision created a serious risk to an inmate's health." 836 F.3d 722, 729 n.2 (7th Cir. 2016) (emphasis in original). But mere disagreement between two medical professionals about the proper course of treatment is insufficient, by itself, to establish an Eighth Amendment violation. Johnson, 433 F.3d at 1013.

Plaintiff claims that the treatment administered by Defendant Shah fell so far below the standard of care that it amounted to no treatment at all. Specifically, Plaintiff relies on expert testimony by Dr. Citronberg for the assertion that penicillin was the incorrect treatment for the symptoms that Plaintiff experienced. Dr. Citronberg testified, however, that although Defendant Shah may not have provided "the *correct* treatment, he *did* provide what he *thought* was the right treatment for him." (Citronberg Dep. 3, ECF No. 44–2) (emphasis added). Importantly, Dr. Citronberg agreed that Plaintiff needed to be administered some antibiotic, but he disagreed with Plaintiff's determination that penicillin was the appropriate one under the circumstances. (Id. at 9).

Plaintiff cites the Seventh Circuit's unpublished decision in Waldrop v. Wexford Health Sources, Inc., 646 Fed. App'x 486, 491 (7th Cir. 2016). In that case, the plaintiff—a type-1 diabetic that relied on daily insulin injections for 40 years—filed suit against a prison doctor that canceled his

insulin and prescribed him a pill that was known to be ineffective. Id. at 488. The plaintiff warned the doctor that the pill "would only work if his pancreas still produced insulin, which it did not, and he requested that he be prescribed insulin." Id. The doctor ignored the plaintiff's request and did not tell the plaintiff that his treatment was changed. Id. As a result, the plaintiff experienced debilitating symptoms and required an emergency dose of insulin. Id. The Seventh Circuit later held that the doctor's decision was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Id. at 492 (citing Pyles, 771 F.3d at 409).

The case at hand is distinguishable from Waldrop. Even in resolving any doubts in Plaintiff's favor as to whether penicillin was the *correct* remedy, the conflicting testimony from several doctors on the record makes clear that Plaintiff's decision was not a significant departure from accepted practices. The doctor Waldrop not only knew that the defendant was reliant on insulin, but he was also informed that the replacement pill would be ineffective. The same cannot be said about Defendant Shah: There is no evidence on the record that suggests that he knew penicillin would not be an effective remedy for the oral infection that Plaintiff experienced. To the contrary, every doctor that testified in this case—apart from Plaintiff's expert, Dr. Citronberg—maintained that penicillin is generally an appropriate treatment for oral infections. Dr. Bailey, for example, a Harvard graduate that ultimately conducted Plaintiff's tracheostomy, agreed the penicillin is "a very common choice" and "an appropriate part of treatment" for oral infections. (Bailey Dep. 58–59, ECF No. 44–5). The same was said by Plaintiff's experts Dr. Jackson, (Jackson's Op. 1, ECF No. 44–4), and Dr. Kushner, (Kushner's Op. 2, ECF No. 44–8).

At bottom, Defendant Shah's decision to prescribe penicillin was made in his professional judgment. Plaintiff's contention that the Court cannot weigh this conflicting expert testimony misses the mark: The question presented is not whether penicillin was the correct treatment, but rather

whether Plaintiff's decision to administer it was such a significant departure from accepted practices that it amounted to no treatment at all. Mere disagreement with the proper course of treatment is insufficient to establish that Defendant Shah was deliberately indifferent to Plaintiff's condition. And no reasonable jury could conclude that Defendant Shah's decision to administer Plaintiff penicillin was so inadequate that it demonstrated an absence of professional judgment.

Plaintiff's argument that Defendant Shah's decision not to immediately send Plaintiff to the emergency room violated the Eighth Amendment also lacks merit. Plaintiff cites to the Seventh Circuit's decision in <u>Berry v. Peterman</u>, 604 F.3d 435, 441 (7th Cir. 2010). The defendant in that case complained of serious toothache to a prison doctor. <u>Id.</u> at 437. The doctor persisted in the same ineffective treatment (over-the-counter pain relievers) for two months before finally permitting the defendant to see a dentist, who conducted a root canal that same day. <u>Id.</u> at 439. The Seventh Circuit later held that the doctor's decision not to send the plaintiff to the dentist for several weeks constituted a ' "gratuitous cruelty" forbidden by the Eighth Amendment." <u>Id.</u> at 441 (quoting <u>Ralston v. McGovern</u>, 167 F.3d 1160, 1162 (7th Cir. 1999)).

<u>Berry</u> is also distinguishable from this case. The doctor in <u>Berry</u> waited several weeks to refer the plaintiff to a specialist, whereas Defendant Shah waited mere days after careful observation. And since it often takes several days for penicillin to take effect, Defendant Shah was not merely persisting in a course of treatment that was *known* to be ineffective. This is especially true considering that Defendant Shah could not obtain Plaintiff's blood sample due to his history of intravenous drug abuse, making it more difficult to determine the treatment's effectiveness. Moreover, Defendant Shah was concerned from the onset about the proliferation of shortness of breath, and Plaintiff was sent to the emergency room at the first symptom of respiratory problems. In short, nothing in Defendant Shah's treatment suggests intentional maltreatment: Defendant Shah treated Plaintiff promptly, regardless of

whether it was the correct treatment. There is no genuine dispute that Defendant Shah's actions were within the bounds of his professional judgment.

Finally, Defendant Wexford cannot be held liable for damages because there is no underlying constitutional violation. And even if a violation did occur, Plaintiff's failed to show that Defendant Wexford's policies were a "direct cause" of or "moving force" behind his constitutional injury. See Minix v. Canarecci, 597 F.3d 824, 832 (7th Cir. 2010); see also Iskander v. Village of Forest Park, 690 F.2d 126, 128 (7th Cir. 1982) (holding that vicarious liability is unavailable in a § 1983 suit). Plaintiff's failure to identify any specific policy or provide evidence of a widespread practice necessarily entitles Defendant Wexford to judgment as a matter of law.

## IV.  CONCLUSION

The Court **ADOPTS** the R. & R. **AS MODIFIED BY THIS OPINION** and **GRANTS** Defendants' motion for summary judgment.

**SO ORDERED.**

**Dated: Tuesday, November 19, 2019**

**S/J. Phil Gilbert**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**